FILED

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

99 NOV -9  AM 10: 07

U.S. DISTRICT COURT
N.D. OF ALABAMA

JEFF WARDEN, et al.,　　　　　　]
　　　　　　　　　　　　　　　　]
　　　Plaintiff(s),　　　　　　　]
　　　　　　　　　　　　　　　　]
vs.　　　　　　　　　　　　　　 ]　　　CV-97-N-2742-NE
　　　　　　　　　　　　　　　　]
CITY OF HUNTSVILLE, et al.,　　 ]
　　　　　　　　　　　　　　　　]
　　　Defendant(s).　　　　　　　]

ENTERED

NOV 0 9 1999

### Memorandum of Opinion

The Court has for consideration motions for summary judgment filed by defendants City of Huntsville ("COH") and Huntsville Police Chief Richard Ottman ("Chief Ottman"), respectively, on October 19, 1998, (Doc. #22 ) and March 22, 1999, (Doc. #60). The issues have been fully briefed and were orally argued at the court's regularly scheduled motion docket on Friday, October 29, 1999. They are now ripe for decision. Upon due consideration, the COH motion will be granted in part and denied in part. Chief Ottman's motion likewise will be granted in part and denied in part.[1]

---

[1] In a related matter, the court has for consideration the plaintiffs' motion to strike, filed November 18, 1998, and defendants' motion to strike, filed December 3, 1998. The court will consider these motions contemporaneously with the motion for summary judgment, and will disregard any portions of the facts and exhibits which are not properly before the court on summary judgment. Furthermore, the court has for consideration plaintiffs' motion to supplement additional undisputed facts filed, October 21, 1999. As for the present opinion and order, the court did not consider any of the facts or evidence submitted contemporaneously with the motion.

I. **Statement of Facts**[2]

    A. **Greg Terry**

        In October of 1987, Gregory K. Terry ("Terry") applied for employment as a police officer with the Huntsville Police Department ("HPD"). He was administered a written examination; a thorough background investigation, which included a polygraph examination and inquiries to former employers, was done; a face-to-face oral interview was conducted; and Terry was offered a position with the HPD. By October of 1988, he had graduated from the Huntsville Police Academy, had completed the Field Training Officer Program, and was working in the Uniform Patrol Division of the HPD.

        In March of 1990, Terry requested an assignment in the D.A.R.E. ("D.A.R.E.") unit of the HPD. On October 1, 1990, Terry was transferred from the Uniform Patrol Division to the training division of HPD, where he assumed a D.A.R.E. Officer Position within the D.A.R.E. unit.[3] The Huntsville D.A.R.E. program is administered and operated by a specialized group of full-time law enforcement officers, who are referred to as the D.A.R.E. unit. It is comprised of six officers (D.A.R.E. officers) who are supervised by one lieutenant and one sergeant. These officers work mainly with local students in a classroom setting, teaching them decision-making skills and showing them how to resist peer pressure which might

---

    [2]In developing the statement of facts in this opinion, the court considered those facts claimed to be undisputed by the parties, the parties' respective responses to those claims, and the court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994), *cert. denied, USX Corp. v. Cox*, 114 S. Ct. 900 (1995).

    [3]D.A.R.E. (Drug Abuse Resistance Education) is a collaborative effort by law enforcement officers, educators, students, parents, and the community to offer an educational program designed to prevent or reduce drug abuse, violence, and gang involvement among children and youth.

influence them to experiment with drugs. Although a large portion of the D.A.R.E. program involves classroom instruction and activity, Chief Ottman stated that as part of their duties, D.A.R.E. officers were expected to work with young people outside "normal" hours. (Ottman Depo. p. 20). Captain Jack Meeks ("Meeks"), testified that D.A.R.E. officers were to act as role models for their charges. (Meeks Depo. pp.82-3). Furthermore, Meeks said it was permissible for Terry, as a D.A.R.E. officer, to have contact with parents, pick up and take children places, and have children stay with him even after his normal work shift had ended. (Meeks Depo. p. 82).

### B.    Adam Mitler's Allegations

On June 21, 1993, Adam Mitler, ("Mitler") through his mother, Debra Mitler, ("Ms. Mitler") filed a complaint with the HPD Internal Affairs Division, alleging that Terry had committed certain criminal acts toward Adam Mitler. On the same day, Internal Affairs notified Chief Ottman of the complaint. Mitler, 14, alleged that Terry had sexually abused him and pointed his gun at him while they were staying at a local hotel[4]. Mitler also stated that Terry had fondled him on one other occasion, that he had spanked his bare bottom on occasion, and that he had shown Mitler X-rated videotapes.

Terry was immediately suspended from performing his duties as a D.A.R.E. officer, reassigned to administrative duty pending an investigation, and unauthorized to have any contact with the public or with any of his then current or former D.A.R.E. students. In June of 1993, the Criminal Investigation Division of the HPD was notified of the allegations and a criminal investigation was begun. On June 25, 1993, as part of the investigation, Terry was

---

[4] Terry was staying at the hotel for a convention of D.A.R.E. officers.

administered a polygraph examination, during which he denied all the allegations of misconduct. According to Captain Wooten, the polygraph examiner and Administrative Assistant to the Chief of Police, Terry's "rating" indicated that he was not deceptive in response to the relevant questions concerning sexual abuse.

In connection with the polygraph examination, Terry submitted an 8-page written statement and was given a pre-test interview. In Terry's statement he admitted he had engaged in certain questionable conduct. He admitted: (1) spending the night in the same hotel room and in the same bed with Mitler; (2) wrestling with Mitler in the bed with the lights off; (3) trying to give Mitler a "wedgie"; (4) discussing the size of each other's penis; (5) prior to the Holiday Inn incident, engaging in discussions with Mitler that were sexual in nature; and (6) knowing that Mitler fondled himself on numerous occasions. In the interview portion of the polygraph examination, Terry disclosed: (1) he had observed Mitler fondle himself, and that Mitler had ask if Terry wanted to "see it"; (2) he had participated in discussions about masturbation with Mitler prior to the Holiday Inn incident; (3) he had seen Mitler's penis while Mitler and he were camping with several other boys and Mitler went skinny dipping; (4) his roommate Robert constantly watched pornographic films; (5) Mitler had slept at his house in the same bed with him on several different occasions prior to the Holiday Inn incident; (6) he "could have" pointed his gun at Mitler while in the hotel room; (7) he had put Mitler in handcuffs on at least one occasion while Mitler was at Terry's house; (8) he had seen Mitler with an erection; (9) while working at a Sheriff's Boys and Girls Ranch in Kentucky, he had numerous young boys spend the night with him in his

room,[5] (10) while in college, a 10 year old boy named Frankie spent the night with him, in the same bed, on several occasions; (11) he had a teenage boy named Charles Hunt spend the night with him in the same bed on several different occasions while Terry was a D.A.R.E. officer;[6] (12) his first sexual experience that produced an ejaculation occurred when he was 12 with a 17 year old neighbor boy, while in a tent together; and (13) he had shaved another man's pubic hair while in college. Following the interview, Captain Wooten met with Chief Ottman, and expressed his opinion that Terry should not be returned to his duties with the D.A.R.E. unit.

During the weeks of August 9, 1993, and September 6, 1993, the allegations of misconduct against Terry by Mitler were presented to the Madison County, Alabama, grand jury by Assistant District Attorney Steven K. Aldridge. The grand jury found insufficient evidence to indict Terry for any criminal offense and a "no bill" was returned. Aldridge, however, told representatives of the HPD that, based on things Terry admitted during his polygraph statement, this situation was like "dynamite waiting to explode." (Aldridge Depo. p. 61). After the finding of a "no bill" the HPD terminated its criminal investigation. Subsequently, the administrative investigation was likewise closed. At the conclusion of the investigation, Chief Ottman, Captain Meeks, and Sergeant Nolan Ozmer held a meeting at which they decided to reinstate Terry as a D.A.R.E. officer. The ultimate decision to reinstate Terry was that of Chief Ottman. However, Chief Ottman made his decision to

---

[5] Upon examination of the Internal Affairs documents, it does not appear that the Ranch was contacted in regards to the 1993 investigation.

[6] Upon examination of the Internal Affairs documents, it does not appear that Hunt was contacted in regards to the 1993 investigation.

reinstate Terry to his position on the D.A.R.E. force without reviewing either Terry's 8-page written statement provided during the polygraph examination or reviewing any portion of the videotaped interview with Terry conducted during the polygraph examination, wherein he had made the admissions cited above.

### C.    The Plaintiffs - Warden, Adams, & Morris

Each of the plaintiffs met Terry while he was working as a D.A.R.E. officer at their school. Moreover, Terry routinely contacted parents, school officials, or coaches about the boys participating in various activities with him. In all of these situations, Terry held himself out to be a D.A.R.E. officer seeking to help the plaintiffs and provide them with a father figure. In 1992, Terry began sexually abusing all three plaintiffs. The alleged abuse took place at Terry's apartment, the lake, the beach, and while camping. For the most part, the abuse continued until the latter part of 1995.

### D.    Jack Adams's Allegations

On September 21, 1995, Jack Adams, through his mother, Karen Adams, filed a complaint with the HPD Internal Affairs Division alleging acts of criminal misconduct by Terry. Just as in the Mitler case, Terry was suspended, and criminal and administrative investigations were begun. On December 18, 1995, while these investigations were pending, Terry resigned his position with the HPD. Consequently, the administrative investigation was closed. On November 15, 1996, Terry took his life.

## II.    Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

6

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Id.* at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

7

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11 (1983) (indicating the standard for summary judgment is "[s]ubstantively . . . very close" to that for motions for directed verdict). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from

8

the facts are functions of the jury, and, therefore, "[t]he evidence of the nonmovant is to be

believed and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at

255. The nonmovant need not be given the benefit of every inference but only of every

reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## III.    42 U.S.C. § 1983

Section 1983 is not a source of federal rights, but merely a method for vindicating

constitutional and federal rights. *Albright v. Oliver*, 510 U.S. 266, 271 (1994). In *Monnell v.*

*New York City Dept. of Social Services*, 436 U.S. 658, 694 (1978), the Court decided that a

municipality may be found liable under § 1983 if the plaintiff shows that a "custom" or

"policy" of the municipality was the "moving force" behind a constitutional deprivation.

This policy requirement ensures that a municipality is held accountable only for "those

deprivations resulting from decisions of its duly constituted legislative body or of those

officials whose acts may fairly be said to be those of the municipality." *Board of County*

*Com'rs, v. Brown*, 520 U.S. 397, 403 (1997); *see also City of Canton v. Harris*, 489 U.S. 378,

385 (1989)(stating it is only when the execution of the government's policy or custom ...

inflicts the injury that the municipality may be held liable under § 1983.) Additionally, if a

practice is so widespread that it has become a "custom," a municipality may be liable in

the absence of formal approval by an appropriate decisionmaker. *Brown* 520 U.S. at 404.

However, liability will not be imposed vicariously on governing bodies solely on the basis

of the existence of an employer-employee relationship with a tortfeasor. *Monnell*, 436 U.S.

at 694. That is to say, a municipality is only liable when it can be fairly said that the city itself

is the wrongdoer. *Collins v. City of Harker Heights*, 503 U.S. 115, 122 (1992).  To ensure

that vicarious liability is not imposed upon local government entities, a plaintiff must demonstrate that the municipality's "deliberate" conduct was the moving force behind the injury alleged. *Brown* 520 U.S. at 404. "A plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.*

### A.   Constitutional Deprivation

Any analysis of a municipality's custom or policy is relevant only when a constitutional deprivation has in fact occurred. *Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir. 1996). In order to obtain relief under § 1983, a plaintiff must demonstrate (1) that the defendants deprived him of a right secured under the United States Constitution or other federal law, and (2) that the deprivation was under color of state law. *Willis v. University Health Services*, 993 F.2d 837, 840 (11th Cir. 1993). Here, the plaintiffs allege that they have been deprived of their constitutional right to bodily integrity and the right to be free from state-occasioned damage to their bodily integrity. (*Opponents' Initial Submission in Response to the Court's Revised Summary Judgment Scheduling Order* p. 3). The defendants argue that since Terry did not act under color of state law but, instead, was engaged in personal gratification, there can be no violation of the plaintiffs' federal protected rights.[7] *See e.g., Pitchell v. Callan*, 13 F.3d 545 (2nd Cir. 1994); *Van Ort v. Estate of Stanewich*, 92 F.3d 831 (9th Cir. 1996). In response, plaintiffs state that Terry was acting under color of state law, or alternatively, that the city, through its hiring practices,

---

[7] The defendants do not dispute that sexual abuse carried out by a person acting under color of state law would be a violation of the right to bodily integrity under the Due Process Clause of the Fourteenth Amendment.

supervisory functions, and retention of Terry, was acting under color of law. *See e.g., Gibson v. City of Chicago,* 910 F.2d 1510 (7th Cir. 1990); *Berry v. City of* Muskogee, 900 F.2d 1489 (10th Cir. 1990); *Stoneking v. Bradford Area School Dist.,* 882 F.2d 720, (3rd Cir. 1989)[8]. Neither the Supreme Court, nor the Eleventh Circuit have addressed the question whether, in a case asserting municipal liability under § 1983 alleging deprivation of bodily integrity, the individual who actually made illicit physical contact with the plaintiff must himself act under color of state law, or whether the decision makers who were deliberately indifferent to a child's liberty interest in his bodily integrity are the state actors who perpetrated the constitutional tort.

Under either rationale, for summary judgment purposes, the defendants have failed to meet their burden. As for Terry's behavior, there is a genuine factual issue as to whether he was acting under color of state law. A person acts under color of state law when he acts with authority possessed by virtue of his employment with the state. *Almand v. DeKalb County, Georgia,* 103 F.3d 1510, 1513 (1997). "The dispositive issue is whether the official was acting pursuant to the power he/she possessed by state authority or acting only as a private individual." *Id.* The facts surrounding Terry's relationship with the plaintiffs demonstrate a genuine issue as to whether he was acting with such power. Relative to the court's decision is the fact that Terry's relationships with the plaintiffs all stem from the D.A.R.E. program to which he was assigned, and subsequently reassigned by the City of Huntsville. (Warden Depo. pp. 48-49); (Adams Depo p. 60); (Morris Depo. pp. 48-49). In

---

[8] Each of these cases stand for the proposition that conduct of the municipality itself may constitute action under color of state law.

addition, some of the plaintiffs' parents stated that Terry's status as a D.A.R.E. officer
influenced their decision to encourage their children to participate in activities with him.
(Carol Warden Depo. p.29); (Karen Adams Depo. pp. 37, 80). Jeff Warden stated that the
reason he went to the lake with Terry was because he was a D.A.R.E. officer. (Warden
Depo. p. 75). Furthermore, Terry held himself out as a police officer on many occasions
when he was with the plaintiffs. Some examples include: (1) Terry would use his police
badge to earn special discounts and gain admission to activities; (2) he would transport
plaintiffs in his D.A.R.E. police car or D.A.R.E. corvette[9]; (3) he would carry his official
Huntsville Police Department handgun with a holster that displayed the D.A.R.E. logo at all
times; and (4) while at the lake, he would wear clothing displaying the D.A.R.E. logo.

Similarly, he used his status as a police officer to threaten and intimidate the
plaintiffs. For example, plaintiffs Adams and Morris testified that Terry had handcuffed
them. (Adams Depo. pp. 160-161; (Morris Depo. p. 76-77). In addition, Terry threatened
both Adams and Morris that if they told anyone about the abuse, he would send them, or
their relatives to jail. (Adams Depo. pp. 104-5, 158-60); (Morris Depo. pp. 98, 105-6). In
particular, according to Morris, every time he threatened to call the police, Terry would
respond by saying, "I am the police." Lastly, Chief Ottman and Captain Meeks stated that
taking kids to movies and functions, and generally working with them outside of "normal
hours" were part of the D.A.R.E. officer's duties. (Ottman Depo. p. 20); (Meeks Depo. p.
76). Specifically, Meeks testified that spending time with kids after hours, on the weekend,
and taking kids places like swimming, camping, spending the night, etc. was encouraged.

---

[9]Plaintiff Adams testified that Terry picked him up and drove him to Tims Ford in the D.A.R.E. corvette.

12

(Meeks Depo. pp. 81-84). The totality of these alleged facts create a genuine issue as to whether Terry was acting pursuant to the power he possessed by virtue of his position as a Huntsville police officer or was acting only as a private individual. Accordingly, summary judgment is not appropriate as to the defendants' assertion that Terry was not acting under color of law.

Likewise, the defendants' under color of law argument fails under the standards imposed by the Third, Seventh, and Tenth Circuits. *See e.g., Gibson*, 910 F.2d 1510; *Berry*, 900 F.2d 1489; *Stoneking*, 882 F.2d 720. In § 1983 cases against municipalities, these circuits have determined that the municipality itself is the state actor and it is the deliberate indifference of the municipality, acting through its final decision maker, that is the cause of the plaintiff's injury. Here, the plaintiffs allege that as a result of its hiring, supervision, and retention of Terry, the City of Huntsville caused the deprivation of the plaintiffs' federally protected right to bodily integrity. In response, the defendants have not demonstrated that such polices were not effectuated by a final decisionmaker. Thus, the City can be characterized as the state actor, and its action in maintaining the alleged policy at issue supplies the "color of law" requirement under § 1983.

In conclusion, for summary judgment purposes, the defendants have not met their burden as to the absence of a constitutional deprivation. The right secured by the Constitution is the right to bodily integrity, and material issues of fact exist as to the under color of law element, regardless of whether the City of Huntsville or Terry is considered the state actor.

## B.    Municipal Liability

A plaintiff seeking to impose liability on a municipality under § 1983 must identify a municipal policy or custom that caused the plaintiff's injury. In the present matter, plaintiffs allege three "policies" which caused their injuries: (1) hiring Terry after an inadequate "screening" and background check; (2) improperly "monitoring" or supervising Terry; and (3) improperly retaining Terry.   However, it is not enough to simply identify conduct attributable to the municipality. *Brown*, 520 U.S. at 404. A plaintiff must also demonstrate that the municipality's "deliberate" conduct was the moving force behind the injury alleged. "A plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.*

Unlike cases where the plaintiffs assert that a municipal action itself violated federal law, or directs an employee to do so, the plaintiffs here do not allege that any of the above decisions were per se illegal.   Instead, they essentially allege that these facially lawful decisions launched a series of events that ultimately caused a violation of federal rights. (*Opponents Initial Submission in Response to the Court's Revised Summary Judgment Scheduling Order* p. 17).   The Supreme Court has instructed that in cases where the municipality has not directly inflicted the injury, "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Brown* 520 U.S. at 405. A plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal conduct was undertaken with

deliberate indifference as to its known or obvious consequences. *Id.* at 407. In addition, the municipality must have caused the deprivation of federal rights. *Id.* at 414.

### 1.    Failure to Adequately Scrutinize Terry's Background

The first "policy" at issue is Huntsville's failure to adequately investigate and scrutinize Terry's background before hiring him as a police officer.[10] This issue was directly addressed by the United States Supreme Court in *Brown.* A failure to scrutinize an applicant's background constitutes deliberate indifference, "[o]nly where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right." *Brown,* 520 U.S. at 411. In *Brown,* an arrestee brought a § 1983 action against the sheriff, arresting officer, and county, as the result of injuries she suffered after being pulled over by a Brown County deputy sheriff. According to the plaintiff, when she did not exit the vehicle, the deputy used an "arm bar" technique which caused her to fall to the ground and severely injure her knees. A review of the deputy's history revealed that he had a record of driving infractions, and had plead guilty to a number of misdemeanors including assault and battery, resisting arrest, and public drunkenness. The Sheriff admitted that he had not closely reviewed the deputy's driving and arrest record. The court said that the county could be held liable only if the violation of the plaintiff's rights was a plainly obvious consequence of the hiring decision. *Id.* at 414. In finding for the county, the court held that there was insufficient evidence on which a jury

---

[10]The defendants do not dispute that the decision to hire Terry was made by the appropriate final decisionmaker.

could base a finding that the hiring decision reflected conscious disregard of an obvious risk that a use of excessive force would follow. *Id.*

In the present matter, the defendants have presented substantial evidence that the pre-hiring investigation of Terry was adequate. It is undisputed that the investigator's written report established: (1) Terry had a prior arrest for public intoxication in 1984; (2) his polygraph examination revealed "no signs of deception"; (3) his former employers regarded him as an excellent employee and that they would consider him for re-employment; (4) his personal references regarded him as intelligent, trustworthy, responsible, and having strong character. In response, the plaintiffs assert that the investigation was inadequate because the defendants did not interview his ex-wife or learn of allegations of abuse against Terry while employed at a Boys and Girls Ranch in Kentucky. First, the failure to interview the ex-wife does not make this investigation inadequate. As for the Kentucky incident, the evidence shows that Helen Barter, an employee of the Ranch, told Huntsville officials that Terry was an excellent employee and was eligible for re-hire. The plaintiffs do not dispute this, and fail to show any reason why the defendants were not entitled to rely on it.

Moreover, Terry was initially hired as a regular uniformed police officer not assigned to the D.A.R.E. unit. There is no evidence to suggest that Huntsville officials did or that they should have anticipated at the time of Terry's appointment that he would at some later time be assigned to the D.A.R.E. unit.

Consequently, the record is devoid of any evidence upon which the court could find a genuine issue of material fact regarding the adequacy of the pre-hiring investigation or

16

whether it was then plainly obvious that Terry would sexually abuse the plaintiffs. Accordingly, the § 1983 claims based on the hiring of Terry warrant summary judgment in favor of the defendants.

### 2.   **Failure to Train/Improper Supervision**

Municipal liability may be based on a claim of failure to properly train or supervise an employee where such conduct evidences a deliberate indifference to the rights of its inhabitants such that the failure to train can be properly thought of as a city policy or custom that is actionable under § 1983. *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). The Eleventh Circuit has stated,

> It is not enough to show that a situation will arise and that taking the wrong course in that situation will result in injuries to citizens.... *City of Canton* also requires a likelihood that the failure to train or supervise will result in the officer making the wrong decision. Where the proper response ... is obvious to all without training or supervision, then the failure to train or supervise is generally not "so likely" to produce a wrong decision as to support an inference of deliberate indifference by city policymakers to the need to train or supervise.

*Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 490 (11th Cir. 1997) quoting *Walker v. City of New York*, 974 F.2d 293, 299-300 (2nd Cir. 1992), *cert. denied*, 507 U.S. 972, (1993)(applying *City of Canton*, 489 U.S. at 390 n. 10, 109 S. Ct. at 1205 n. 10). *Sewell* involved a municipal police officer who coerced a female arrestee to submit to a strip search in exchange for a reduced charge. The Eleventh Circuit held that deliberate indifference cannot be found to exist where the employee should have known without training or supervision that his conduct was obviously wrong in the circumstances. It goes without saying that it is obviously improper for a D.A.R.E. officer to sexually abuse young

17

men who have been placed in his charge by their parents and school officials. It was not necessary for Huntsville officials to train or supervise Terry so that he would refrain from doing that which was obviously wrong.

Accordingly, the failure to supervise or train Terry on issues of the abuse of children in his care cannot form the basis for municipal liability. The defendants' motion for summary judgment on the supervision/training claim is hereby granted.

### 3.   Retaining Terry after the Mitler Investigation

The defendants describe the retention of Terry as an "inaction" claim as articulated by the Sixth Circuit in *Doe v. Claiborne County, Tenn.*, 103 F.3d 495 (6th Cir. 1996). In *Doe*, the plaintiff, a high school student who was sexually abused by a teacher (Davis), brought a § 1983 action against the board of education, members of the school board, past and present superintendents, and the school principal. The undisputed facts revealed that after numerous complaints of abuse, Davis was reassigned to work in the school's bus garage and that he was not rehired for the forthcoming school year. However, even after four of the allegations were determined to be "founded," Davis was eventually rehired for a position at Doe's school, after which he began to abuse the plaintiff. On appeal before the Sixth Circuit, the plaintiff's § 1983 claim against the county and school board rested on two theories - (1) the school board had a "custom" or "policy" of inaction when faced with a pattern of misconduct by its employees[11] and (2) that Tennessee's in loco parentis statute creates a "special relationship" between Doe and the school. It is important to note that on appeal, Doe did not challenge the actual rehiring of Davis as the "policy" which evidences

---

[11]Doe argued that the School Board's custom was having a "good old boys network."

18

a deliberate indifference to her constitutional right to bodily integrity.[12]  Applying a three-tiered "inaction test," the court decided that the evidence advanced by Doe did not show that the school board had a "custom" that reflected a deliberate intentional indifference to the sexual abuse of its students. *Id.* at 508.

In contrast to *Doe*, the Warden plaintiffs appear to assert that the formal decision to retain Terry as a D.A.R.E. officer was a "policy" that reflected a deliberate indifference to the sexual abuse of the plaintiffs.  There is no indication that the plaintiffs assert that the city had a "custom" of retaining or rehiring employees despite the filing and investigation of disciplinary charges against them.  Accordingly, the first issue to be resolved is whether the decision to retain Terry as a D.A.R.E. officer was a "policy" for § 1983 purposes.  A policymaker's single decision may constitute "official policy" under § 1983. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 124-27 (1988); *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986)(stating that a final decisonmaker's adoption of a course of action tailored to a particular situation and not intended to control decisions in later situations may, in some circumstances, give rise to municipal liability under § 1983).  The defendants do not dispute that retaining Terry was made by the appropriate final decisionmaker, Chief Ottman.  Moreover, the defendants point to no evidence to suggest that the decision to retain Terry was anything other than official policy.

It is not enough, however, for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality.  The plaintiff must also demonstrate that, through its

---

[12]The court, in dicta, did state that if plaintiff had argued that the rehiring decision was a "policy," there was no direct causation between such policy and the sexual abuse inflicted by Davis. *Doe*, 103 F.3d at 509.

deliberate conduct, the municipality was the moving force behind the injury alleged. *Brown*, 520 U.S. at 404. Unlike a failure to train or "inaction" claim, neither the Eleventh Circuit nor the Supreme Court has articulated a test or standard for retention claims. However, because a decision to retain an employee after he has been suspended is analogous in some respects to an initial hiring, the standards of deliberate indifference and causation articulated in *Brown* should control this issue. The plaintiffs, then, must demonstrate that the retention of Terry reflects Huntsville's deliberate indifference to the risk that a violation of the plaintiffs' rights to bodily integrity would likely follow that decision.

The defendants argue that the evidence suggests the absence of "deliberate indifference" on the part of the City. First, upon learning of the charges against Terry, it twice immediately suspended him from the D.A.R.E. unit, and two departmental investigations were promptly commenced. Terry was not authorized to have any contact with any of his current or former D.A.R.E. students. In addition, the City of Huntsville administered a polygraph examination to Terry concerning the specific allegations of misconduct made by Adam Mitler. During this examination, Terry denied all allegations of misconduct, and he showed no signs of deception. Furthermore, Mitler's allegations against Terry were presented to a Madison County, Alabama, grand jury for review. Eventually, a "no-bill" was returned on the criminal charges. Consequently, the police department's internal affairs investigation determined that the Mitler allegations were unfounded and the investigation was closed. By September of 1993, Terry was formally returned to his D.A.R.E. position.

However, the 1993 investigation unearthed a plethora of questionable conduct on the

20

part of Terry. For example, Terry admitted to: wrestling with Mitler in the bedroom; wearing red bikini underwear while in bed with him at a local hotel; placing handcuffs on Mitler while at his house; and, pulling Mitler over his lap to spank him while the two were alone in Terry's bedroom. In addition, the pre-polygraph examination revealed that among other things, Terry and Mitler discussed penis size and sexual issues. The interview portion of the polygraph examination revealed: Terry had observed Mitler fondle himself, and that Mitler would "ask if he wanted to see it"; he had participated in discussions about masturbation with Mitler; he had seen Mitler's penis while Mitler and he were camping with several other boys and Mitler went skinny dipping; that Mitler had slept at his house in the same bed with him on several different occasions prior to the Holiday Inn incident; he had seen Mitler with an erection; he had numerous young boys spend the night with him in his room while he was a counselor with the Sheriff's Boys and Girls Ranch in Kentucky; that a 10 year old boy named Frankie had spent the night with him, in the same bed, on several occasions while Terry was in college; and a teenage boy named Charles Hunt spent the night at Terry's house and slept with him in the same bed on several different occasions while Terry was employed as a D.A.R.E. officer for the City of Huntsville.[13]

Moreover, City of Huntsville officials recommended that Ottman not retain Terry as a D.A.R.E. officer. Following the polygraph examination, Captain Wooten, the Administrative Assistant to the Chief of Police, met with Chief Ottman and expressed his opinion that Terry should not be allowed to remain on the D.A.R.E. unit. Assistant District

---

[13]The Internal Affairs Investigation File contained no indication that the City contacted the Boys and Girls Ranch or Charles Hunt during its investigation.

Attorney Steve Aldridge expressed to City of Huntsville officials that in his opinion, Terry's conduct was inappropriate, if not criminal, and that Terry's situation was "dynamite waiting to explode."[14] However, despite his knowledge of the circumstances, Chief Ottman made the ultimate decision to reinstate Terry. It is undisputed that he made the decision without reviewing Terry's 8-page written statement provided during the polygraph investigation or any part of the videotaped interview with Terry conducted during the polygraph examination.

Although Terry passing the polygraph and the grand jury's "no-bill" narrow the question somewhat, the plaintiffs have presented sufficient evidence to create a genuine issue of material fact as to whether the city was deliberately indifferent. Reinstating Terry to a position where he again would have daily contact with adolescents both in and out of the classroom despite the substantial evidence of questionable conduct on the part of Terry, coupled with the statements of Huntsville officials, and Ottman's neglect of the essential and detrimental evidence in the polygraph videotape and written statement, all indicate an indifference to the plaintiffs' rights. Accordingly, a genuine issue of fact is created as to whether a reasonable decisionmaker, after learning of Terry's conduct and the statements of city officials, would conclude that the plainly obvious consequence of Terry's retention would be the infringement of the plaintiffs' due process rights to the personal integrity of their bodies. It would be entirely reasonable for a fact finder to conclude that in light of Terry's conduct, including but not limited to sleeping with adolescents and discussing penis size and masturbation, reinstating him as a D.A.R.E. officer would lead to sexual

---

[14] It is unclear whether Chief Ottman was informed of Mr. Aldridge's opinion.

abuse of the program's participants.

In order to avoid having municipalities held liable on the basis of respondeat superior, the law requires a plaintiff to present proof that the specific policy in question caused the specific violation. *Gold,* 151 F.3d at 1351 n.10 (11th Cir. 1998). As the Supreme Court has explained,

> to adopt lesser standard of fault and causation would open municipalities to unprecedented liability under § 1983. In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city "could have done" to prevent the unfortunate incident.

*City of Canton*, 489 U.S. at 391-92. Proximate causation is an issue normally left up to the jury. Here, the defendant has not presented evidence to demonstrate the absence of a genuine issue of material fact as to causation. Accordingly, the issue of causation survives summary judgment, and is left up to the determination of a jury. *See e.g., Howell v. Burden*, 12 F.3d 190, 194 (11th Cir. 1994). The defendant's motion for summary judgment insofar as it is addressed to the retention of Terry as a D.A.R.E. officer will be denied.

## IV.   Qualified Immunity - Chief Richard Ottman

Government officials, such as the Chief of Police, performing discretionary functions are entitled to qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). There is no dispute that Ottman was acting within his discretionary authority as the Chief of Police at all times relevant to this matter. Accordingly, the pertinent issue is whether his conduct violated clearly

23

established constitutional rights of which a reasonable person would have known.

According to the Supreme Court, "[a] court evaluating a claim of qualified immunity must first determine whether the plaintiff has alleged the deprivation of an actual statutory or constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Wilson v. Layne*, 116 S. Ct. 1692, 1697 (1999). Here, the plaintiffs have alleged that they suffered sexual abuse at the hands of Terry, which was caused by the policies of the City of Huntsville, in violation of their constitutional right to bodily integrity. As the foregoing discussion demonstrates, the court has already concluded that for summary judgment purposes, the plaintiffs have alleged and suffered a constitutional deprivation.

Although it is not entirely clear, it appears that the plaintiffs seek to hold Chief Ottman liable based upon his decision to retain Terry as a D.A.R.E. officer after the Mitler allegations. Although he court has already expressed the view that Ottman's decision created a genuine issue as to whether he was deliberately indifferent, to hold him liable in his individual capacity plaintiffs must create a genuine issue of material fact regarding whether it was "clearly established" at the time the decision was made that it would violate the rights of these plaintiffs. The Eleventh Circuit Court of Appeals has stated,

> [i]n satisfying this burden, the plaintiff cannot point to sweeping propositions of law and simply posit that those propositions are applicable. Instead, the plaintiff must draw the court's attention toward a more particularized and fact-specific inquiry . . . showing that there existed sufficient case law establishing the contours of his or her constitutional rights such that the unlawfulness of the defendant's conduct would have been apparent to a reasonable official in the same circumstances. . .. If no such case law exists, then the defendant is entitled to

qualified immunity.

*Nicholson v. Georgia Dept. of Human Resources*, 918 F.2d 145, 147 (11th Cir. 1990); *see also*
*Lassiter v. Alabama A&M Univ*, 28 F.3d 1146, 1149 (11th Cir. 1994)(en banc)(stating that
government agents act must be so obviously wrong, that only a plainly incompetent officer
would have done such a thing).

The plaintiffs terse response to the qualified immunity issue states that (1) at the time
of Ottman's decision it was clearly established that the right to be free from state-
occasioned damage to a person's bodily integrity was protected by the Fourteenth
Amendment, and (2) that from the defendants' viewpoint, the unlawfulness of Terry's
conduct should have been "readily apparent even without clarifying caselaw." (*Opponents'*
*Initial Submission in Response to the Court's Revised Summary Judgment Scheduling*
*Order* p. 9). As to the first assertion, plaintiffs have not cited to a single case which
developed the law in a sufficiently concrete, factually-defined context so as to have made
it obvious to Ottman that by retaining Terry, he was violating plaintiffs' Fourteenth
Amendment Due Process rights to the integrity of their bodies. Moreover, *Board of County*
*Com'rs v. Brown*, the seminal deliberate indifference hiring case analogous to the retention
issue in the present matter, was not decided until 1997. The plaintiffs' reference to general
rules and to the violation of abstract rights does not discharge their burden. Accordingly,
the plaintiffs have not satisfied their burden in regards to the clearly established element
of qualified immunity.

Under their second theory (readily apparent nature), the plaintiffs have also failed
to carry their burden. Foremost, the proper analysis examines Ottman's conduct, not

whether Terry's conduct was obviously unlawful. Moreover, the plaintiff has failed to include any analysis of why the present violation of constitutional rights deserves to fall within the "slender category" of cases which the unlawfulness of conduct is readily apparent even without clarifying caselaw. *See e.g., Smith v. Mattox*, 127 F.3d 1416 (11th Cir. 1997). Accordingly, the § 1983 claims against Ottman in his individual capacity are barred by the doctrine of qualified immunity and his motion for summary judgment will be granted on that basis.

## V.    State Law Claims

### A.    City of Huntsville

Alabama Code § 11-47-23 states that claims against a municipality for damages growing out of torts shall be presented within six months from the accrual thereof or shall be barred. Additionally, Alabama Code § 11-47-192 declares that no recovery shall be had against any city or town on a claim for personal injury received, unless a sworn statement is filed with the clerk by the party injured or his personal representative in case of his death stating substantially the manner in which the injury was received, the day and time and the place where the accident occurred and the damages claimed. It is undisputed that the plaintiffs' state law claims against the City of Huntsville do not comply with the above statutes. For that reason, the plaintiffs seek a ruling that the statutes are unconstitutional, or alternatively, that the court should make an exception to the notice of claim rule for minor children who have been abused by an authority figure. *See e.g., Chalmers v. County of Chemung*, 105 A.D. 2d 885 (App. Div. 1984). As to the unconstitutionality issue, although the plaintiffs' argument is not entirely without merit, in light of the Alabama Supreme Court

26

upholding the statute as constitutional, any contrary argument by the plaintiffs must fail. *See Eason v. City of Huntsville*, 347 So.2d 1321 (Ala. 1977) *overruled on other grounds, Diemert v. City of Mobile*, 474 So.2d 663 (Ala. 1985); *Parton v. City of Huntsville*, 362 So.2d 898 (Ala. 1978). Furthermore, as to the special exception for child abuse cases, this is a matter more properly considered by Alabama officials rather than a U.S. District Court.

Accordingly, all state law claims against the City of Huntsville will be dismissed for the plaintiffs' failure to comply with the notice requirements of § 11-47-23.

## B.    Chief Ottman

Plaintiffs assert the following state law claims against Ottman: (1) negligent hiring, supervision, and retention; (2) assault, battery, negligence, wantonness, suppression, and outrage, and (3) civil conspiracy.

### 1.    Negligent Hiring, Supervision, and Retention

Defendants assert they are entitled to summary judgment as to the negligent hiring, supervision, and retention state law claims because these types of claims are only actionable against the employer of an alleged incompetent employee. However, the cases cited by the defendant, *Big B, Inc. v. Cottingham*, 634 So.2d 999 (Ala. 1993), *Lane v. Central Bank of Alabama*, 425 So.2d 1098 (Ala. 1983), and *Nash v. Segars*, 682 So.2d 1364 (Ala. Civ. App. 1996) do not unequivocally stand for this proposition. *See e.g., Nance v. Matthews*, 622 So.2d 297 (Ala. 1993)[15]. Nonetheless, the negligent hiring claim warrants summary

---

[15]The cases cited by the defendant discuss liability in terms of the master-servant relationship. The Alabama Supreme Court has defined "master" as one who has supreme choice, control and direction and whose will the servant represents, not merely in ultimate result of his work, but in all its details. *Hiller v. Goodwin*, 65 So.2d 152 (1953). Here, the defendants fail to state why in this situation Ottman can not be considered the "master."

judgment. In order to prevail in a negligent hiring case, a plaintiff must show that an employee was acting within the line and scope of his employment. *Nash*, 682 So.2d at 1365. Here, it is undisputed that Terry's abuse was not in furtherance of any requirement or duty of his job as a D.A.R.E. officer. Consequently, summary judgment will be granted in favor of the defendant as to the negligent hiring claim. To recover under the theory of negligent supervision, a plaintiff first must show by affirmative proof that the alleged incompetence of the employee was actually known to the employer or was discoverable by the employer if it had exercised care and proper diligence. *Ledbetter v. United Am. Ins. Co.*, 624 So.2d 1371, 1373 (Ala.1993). Similarly, a negligent retention claim requires the plaintiff to show that the defendant breached its duty to retain unworthy employees. *Brown v. Vanity Fair Mills*, 277 So.2d 893, 894 (1973). Ottman asserts that there is not sufficient evidence which demonstrates that he knew or should have known that Terry had actually physically or sexually abused the boys. However, Ottman knew, or should have known, of the evidence from the Mitler investigation which indicated questionable conduct on the part of Terry. Accordingly, a jury question is created as to whether Ottman negligently supervised and retained Terry[16].

### 2. Assault, Battery, Negligence, Wantonness, Suppression, & Outrage

The defendants assert that such claims against Ottman warrant summary judgment because no Alabama case law supports these theories of recovery against Ottman.

---

[16] The court notes that Ottman did not raise the discretionary immunity defense in either motion for summary judgment. Under Alabama law, qualified immunity from suit for negligence arising out of a discretionary act is an affirmative defense which must be raised and *proved* by the defendant. *Phillips v. Thomas*, 555 So.2d 81 (Ala. 1989). Although it was pleaded in the answer, the defendant has not argued this defense in the motion for summary judgment.

28

Moreover, according to the defendants, the only relevant authorities addressing this issue support their argument. *See Newton v. Town of Columbia*, 695 So.2d 1213 (Ala. Civ. App. 1997)(holding that a municipality's chief executive is not vicariously liable for the misconduct of his or her subordinates). In their responsive brief, the plaintiffs do not respond to these arguments, nor do they even address these claims. Accordingly, a genuine issue of material fact has not been created and summary judgment is appropriate as to these claims.

### 3.    Civil Conspiracy

Under Alabama law, a civil conspiracy claim rests upon the viability of the underlying civil wrong made the subject of the conspiracy. *Barber v. Business Products Center, Inc.* 677 So.2d 223, 228 (Ala. 1996). Defendants assert that plaintiffs have not alleged an underlying civil wrong to support their civil conspiracy claim. In response, plaintiffs merely state that there is evidence of such civil wrong, but fail to articulate what it is. Furthermore, the defendant has demonstrated that there is no evidence to support a "cover up" or that he conspired to commit an act injurious to public health, public morals, etc. In response, plaintiffs mention a cover up of the police investigation of Terry and attempts at sweeping the matter under the rug, but fail to demonstrate any substantive evidence to rebut the defendants assertion that there is no genuine issue for trial. Accordingly, summary judgment for the defendant will be granted on to the conspiracy claim.

### 4.    Conclusion

The defendants' motion for summary judgment as to the § 1983 claim for the City of Huntsville's retention of Terry is denied. The motion for summary judgment is granted for

29

the hiring and supervision claims. As for Chief Ottman, summary judgment is appropriate for the § 1983 claims against him in his individual capacity, as he is protected by qualified immunity. All of the state law claims against the City of Huntsville are dismissed for a failure to comply with the requisite statutory provisions. Furthermore, all of the state law claims asserted against Ottman, except for negligent supervision and retention, are dismissed.

Done, this ___9th___ of November, 1999.

_____
EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE